[No. G028293. Fourth Dist., Div. Three. Sept. 10, 2002.]

RICCARDO CARRETTI, Cross-complainant and Appellant, v. ITALPAST, Cross-defendant and Respondent.

COUNSEL

Lawson, Macrae, Gress & Culbertson, Jean M. Moriarty; Greines, Martin, Stein & Richland and Marc J. Poster for Cross-complainant and Appellant.

Gordon & Rees, P. Gerhardt Zacher, Patricia Lee-Gulley and Linda J. Sinclair for Cross-defendant and Respondent.

OPINION

**MOORE, J.**—Defendant and cross-complainant Riccardo Carretti doing business as Saima Pasta Equipment (Carretti) appeals from an order granting a motion to quash service of summons. The motion was filed by defendant and cross-defendant Italpast, an Italian manufacturer doing business in Italy. Carretti, a distributor with an office in California, contends Italpast, which sold products to him in Italy, has the requisite minimum contacts to support jurisdiction. We disagree.

Carretti did not meet his burden to show the requisite minimum contacts to establish either general jurisdiction or specific jurisdiction. He did not show the substantial, continuous and systematic contacts necessary for general jurisdiction. He also failed to provide sufficient evidence to show that Italpast, having placed its products into the stream of commerce in Italy, either intended to serve the California market or was aware its product was being marketed in the forum. Thus, under the stream of commerce theory enunciated in *World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286 [100 S.Ct. 559, 62 L.Ed.2d 490] (*World-Wide Volkswagen*), and further explored in *Asahi Metal Industry Co., Ltd. v. Superior Court* (1987) 480 U.S. 102 [107 S.Ct. 1026, 94 L.Ed.2d 92] (*Asahi*), specific jurisdiction was lacking. We affirm.

I

FACTS

A. *Procedural History*

Restaurant worker Jorge Salgado, employed by the Pasta Bravo restaurant in Irvine, California, filed a complaint alleging he was seriously injured when using a pasta-making machine manufactured by Italpast. According to the complaint, Salgado, who is not a party to this appeal, lost his right arm below the elbow when trying to unclog the machine. He filed suit against

both Italpast and Carretti, the distributor who had sold the machine to the restaurant. Carretti filed a cross-complaint for indemnity against Italpast and Pasta Bravo.

Italpast, an Italian corporation doing business in Italy, filed a motion to quash service of summons for lack of personal jurisdiction. The trial court denied the motion. Italpast then filed a petition for a writ of mandate. This court, in case No. G028018, ordered the issuance of an alternative writ of mandate directing the trial court to either vacate its order denying the motion to quash or show cause why a peremptory writ of mandate should not be issued. In response, the trial court vacated its order and granted the motion to quash. This court then discharged the alternative writ and denied the petition for a writ of mandate as moot. Carretti filed a notice of appeal from the order granting the motion to quash.

B. *Contacts with the Forum*

Italpast sells pasta-making machines and other products. It does not market or advertise its products in the United States, but it does send product information to the United States on request. Italpast has no offices or employees in the United States. It does not have a contract with Carretti or any other distributor to distribute its products in the United States. Italpast has never sold goods directly to California users and Carretti is the only buyer from California who has purchased products from Italpast.

Carretti maintains an office in Orange County, California. He has sold Italpast products in the United States and other countries. At the time Carretti filed his opposition to the motion to quash, he had been doing business with Italpast for approximately seven years, purchasing pasta-making machines and other products. He travels to Italy about twice a year to purchase the goods. There, he has purchased more than 20 machines, some of which he resold for use in California. Italpast delivers the goods Carretti orders to a shipping company he uses in Milan. Carretti pays for the shipping and insurance and bears the risk of loss during shipping.

To demonstrate that Italpast was aware it was doing business with a distributor with a California office and that its products could wind up in California, Carretti provided three Italpast sales receipts for the year 1995. They reflected that he was the purchaser, his office was located in California, and the ports of entry for the three shipments were Atlanta, Chicago and Los Angeles, respectively. Carretti took title to each of these shipments in Italy. Two of the purchases were in the amount of $4,240 each and the third was in the amount of $4,452. Between 1994 and 1999, Italpast's annual sales

ranged from $3.2 million to $3.7 million. Carretti provided no evidence as to the number or value of total sales to California users in any of the seven years in question.

In addition to the three invoices for 1995, the parties provided a fourth invoice, showing a consignee in Russia, and evidence of telephone contacts and correspondence between Italpast in Italy and Carretti in his California office. They provided 23 items of correspondence and other documentation between Carretti and Italpast dated from 1993 to 1998. A significant number of items concerned price lists and brochures, most or all of which Italpast provided at Carretti's request. Several items concerned a Carretti request for replacement parts for a particular model machine. Italpast acknowledges it has sent some replacement parts to Carretti, but only on his request.

The evidence shows some more substantial contacts with respect to a customer in Benicia, California. In two letters, Italpast and Carretti exchanged technical information and specifications regarding modifications to the customer's machine. In other correspondence, Carretti requested that Italpast provide replacement parts directly to the customer. Moreover, there is correspondence showing that two different Italpast representatives traveled to California to meet with this customer, at Carretti's request. Carretti reimbursed Italpast for the travel, lodging and pay for at least one of these representatives.

Additional correspondence indicates that a third individual, an Italpast technician, traveled to the United States at Carretti's request, but the particular location within the country was not designated in the correspondence. Carretti paid for the technician's travel, lodging and remuneration.

II

DISCUSSION

A. *Introduction*

Carretti claims the trial court erred in granting the motion to quash because Italpast had sufficient contacts with the forum for both general and specific jurisdiction. He also asserts that this court is not precluded from so ruling by virtue of the fact that we previously issued an alternative writ and later on summarily denied the writ petition.

Where the effect of the alternative writ and the order denying the writ petition are concerned, Carretti is quite right. "Contrary to popular

belief, we sometimes issue . . . alternative writs and orders to show cause not because we have made up our minds that the petition ought to be granted but because we perceive a genuine dispute and want to hear the other side of the story." (*Solorzano v. Superior Court* (1992) 10 Cal.App.4th 1135, 1138, fn. 1 [13 Cal.Rptr.2d 161].) As further explained in *Gammoh v. City of Anaheim* (1999) 73 Cal.App.4th 186, 196 [86 Cal.Rptr.2d 194]: "Just because a Court of Appeal denies a petition for writ of mandate does not mean it has made a decision on the merits having res judicata effect. The proper rule, as expressed by the Supreme Court, is that unless there is a written opinion following the issuance of an alternative writ, the denial of a writ petition does not have issue preclusive effect. [Citations.]" We will, as Carretti urges, give the jurisdictional issues thorough consideration.

## B. *Principles of Jurisdiction*

 Countless cases provide insight into the laws of personal jurisdiction in the State of California. To obtain a general overview, however, we need consult only one. The general parameters of personal jurisdiction in California are neatly laid out in the California Supreme Court's decision in *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434 [58 Cal.Rptr.2d 899, 926 P.2d 1085] (*Vons Companies*).

As stated in *Vons Companies, supra,* 14 Cal.4th 434, "California's long-arm statute authorizes California courts to exercise jurisdiction on any basis not inconsistent with the Constitution of the United States or the Constitution of California. (Code Civ. Proc., § 410.10.) A state court's assertion of personal jurisdiction over a nonresident defendant who has not been served with process within the state comports with the requirements of the due process clause of the federal Constitution if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate ' "traditional notions of fair play and substantial justice." ' [Citations.]" (*Id.* at pp. 444-445.)

"Personal jurisdiction may be either general or specific. A nonresident defendant may be subject to the *general* jurisdiction of the forum if his or her contacts in the forum state are 'substantial . . . continuous and systematic.' [Citations.] In such a case, 'it is not necessary that the specific cause of action alleged be connected with the defendant's business relationship to the forum.' [Citations.] Such a defendant's contacts with the forum are so wide-ranging that they take the place of physical presence in the forum as a basis for jurisdiction. [Citation.]" (*Vons Companies, supra,* 14 Cal.4th at pp. 445-446.)

"If the nonresident defendant does not have substantial and systematic contacts in the forum sufficient to establish general jurisdiction, he or she

still may be subject to the *specific* jurisdiction of the forum, if the defendant has purposefully availed himself or herself of forum benefits [citation], and the 'controversy is related to or "arises out of" a defendant's contacts with the forum.' [Citations.]" (*Vons Companies, supra,* 14 Cal.4th at p. 446.)

■ "When a defendant moves to quash service of process on jurisdictional grounds, the plaintiff has the initial burden of demonstrating facts justifying the exercise of jurisdiction. [Citation.] Once facts showing minimum contacts with the forum state are established, however, it becomes the defendant's burden to demonstrate that the exercise of jurisdiction would be unreasonable. [Citation.] When there is conflicting evidence, the trial court's factual determinations are not disturbed on appeal if supported by substantial evidence. [Citation.] When no conflict in the evidence exists, however, the question of jurisdiction is purely one of law and the reviewing court engages in an independent review of the record. [Citation.]" (*Vons Companies, supra,* 14 Cal.4th at p. 449.)

■ In the case before us, there is no conflict in the evidence, so we review the matter de novo. We shall consider Carretti's arguments as to general jurisdiction and specific jurisdiction in turn.

## C. *General Jurisdiction*

We begin our analysis by asking whether Italpast's contacts with the forum state are substantial, continuous and systematic. (*Vons Companies, supra,* 14 Cal.4th at p. 445.) Carretti contends they are. As Carretti sees it, Italpast has been conducting business with him "consistently and for years." Carretti acknowledges that he "does not sell *all* of Italpast's products to California users," but he does distribute "*some* of Italpast's products to California users" and he maintains an office in California. (Italics added.) He emphasizes that "Italpast knows this is the case," because Carretti has told Italpast as much and Italpast has sent representatives to assist California users.

Carretti also reminds us that Italpast has sent price lists to him in California and has sold him products "knowing they *could be* distributed and used in California." (Italics added.) He also indicates that Italpast has provided replacement parts for its products situated in California and has modified a machine for a California user.

We do not agree that these contacts amount to the substantial, continuous and systematic contacts required for general jurisdiction. Carretti admits that he made the purchases in Italy. While he says he resold *some* of Italpast's

products in California, he does not say how many or how often. Carretti provides no indication of the type, quantity, or dollar value of the goods sold to California users. He has only shown us that out of 20-some machines purchased over seven years, at least two were put to use in California and Italpast sent representatives to deal with one of the purchasers on two occasions. These are not the kinds of wide-ranging contacts that take the place of physical presence in the forum. (*Vons Companies, supra,* 14 Cal.4th at p. 446.)

The decisions in *Cassiar Mining Corp. v. Superior Court* (1998) 66 Cal.App.4th 550 [78 Cal.Rptr.2d 167] (*Cassiar*) and *As You Sow v. Crawford Laboratories, Inc.* (1996) 50 Cal.App.4th 1859 [58 Cal.Rptr.2d 654] (*As You Sow*) are dispositive. In *Cassiar*, the defendant was incorporated in Canada and mined and milled raw asbestos in British Columbia. It sold raw asbestos fibers to manufacturers, including several different companies with California plants. For 38 years, the defendant sold thousands of tons of raw asbestos to California operations. Ultimately, workers with progressive lung diseases, who alleged asbestos fiber exposure had caused their ailments, sued the defendant in California. Despite the fact the defendant had sold thousands of tons of its product to several California companies over a period of 38 years, there was no general jurisdiction.

As we stated in *Cassiar, supra,* 66 Cal.App.4th at page 555, the defendant's "contacts with California [did] not appear to be so continuous and systematic as to establish California's general jurisdiction over any cause of action against [the defendant], regardless of its relationship with the forum. [Citation.] A Canadian company headquartered in Vancouver, [the defendant] had no offices, employees, bank accounts, or real property within the state. It did not advertise in any California trade journals or publications."

Like the defendant in *Cassiar, supra,* 66 Cal.App.4th 550, Italpast had no offices or employees in the state and did not advertise in any California trade journals or publications. There is no assertion Italpast had bank accounts or real property in the state, or that it had any contacts whatsoever with the state other than its contacts with Carretti. In *Cassiar*, the sale of thousands of tons of asbestos to several California plants over a period of 38 years did not constitute the substantial, continuous and systematic contacts necessary to establish general jurisdiction, and here, the sale of 20-some pasta-making machines over seven years to someone who just happens to have an office in California does not give rise to general jurisdiction either.

*As You Sow, supra,* 50 Cal.App.4th 1859, dictates the same result. In that case, there was no general jurisdiction when an Illinois paint manufacturer

sold products to private California distributors and the General Services Administration (GSA). It shipped some of its products to a GSA depot in California. Products either remained in California or were shipped to 16 different western states and Pacific overseas locations. All contract negotiations with GSA took place outside of California. The defendant knew some of the products would remain in California, but had no control over the products' final destination. The court held the unilateral activities of the GSA could not provide California with jurisdiction over the defendant. (*Id.* at p. 1868.) "Merely knowing the product will enter California, without having some control over its ultimate destination, does not satisfy the due process clause of the United States Constitution." (*Id.* at p. 1869.) "No evidence showed [the defendant] intended to serve a market in California with the products it shipped to the G.S.A." (*Ibid.*, fn. omitted.)

Here, the sales to Carretti took place overseas. Italpast knew some of the products could be sent to California, just as they could be sent to any other part of the world where Carretti did business. The two machines known to have been put to use in California were resold due to the unilateral activity of Carretti and Italpast had no control over their ultimate destination. There is no evidence Italpast intended to serve a market in California just because it sold its products to Carretti in Italy and sent pricing information to him in California on request.

As the California Supreme Court stated in *Fisher Governor Co. v. Superior Court* (1959) 53 Cal.2d 222, 225 [1 Cal.Rptr. 1, 347 P.2d 1]: "Although a foreign corporation may have sufficient contacts with a state to justify an assumption of [general] jurisdiction . . . [citations], more contacts are required for the assumption of such extensive jurisdiction than sales and sales promotion within the state by independent nonexclusive sales representatives. [Citations.] To hold otherwise would subject any corporation that promotes the sales of its goods on a nationwide basis to suit anywhere in the United States without regard to other considerations bearing on 'the fair and orderly administration of the laws which it was the purpose of the due process cause to insure.' [Citations.] Accordingly, we must look beyond defendant's sales activities in this state to determine whether jurisdiction may constitutionally be assumed." (Accord, *Vibration Isolation Products, Inc. v. American Nat. Rubber Co.* (1972) 23 Cal.App.3d 480, 483-484 [100 Cal.Rptr. 269]; see also *Congoleum Corp. v. DLW Aktiengesellschaft* (9th Cir. 1984) 729 F.2d 1240 [sales and marketing efforts through an independent nonexclusive sales representative doing business in California are insufficient to establish general jurisdiction].)

In this case, Italpast did not promote the sales of its goods on a nationwide basis. In fact, it did not promote the sales of its goods in the United States or

California at all. It simply sold goods to a buyer who showed up on its doorstep in Italy, willing to pay the price. The minimal resales in this state by Carretti, an independent distributor, standing alone, do not amount to the substantial, continuous and systematic contacts with the forum state necessary for the exercise of general jurisdiction over Italpast, a foreign corporation doing business in its home country.

## D. *Specific Jurisdiction*

Carretti argues California courts have specific jurisdiction over Italpast because Italpast put its pasta-making machines into the stream of commerce knowing they could be used in California and because Italpast purposefully availed itself of the benefits of doing business with a California company that distributed Italpast's product to a California user. We disagree.

### (1) *Stream of commerce theory: World-Wide Volkswagen*

■ The seminal case on the stream of commerce theory is *World-Wide Volkswagen, supra,* 444 U.S. 286. In that case, the United States Supreme Court stated: "When a corporation 'purposefully avails itself of the privilege of conducting activities within the forum State,' [citation], it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. Hence if the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State. [Citation.]" (*Id.* at pp. 297-298 [100 S.Ct. at p. 567].)

■ Applying the *World-Wide Volkswagen, supra,* 444 U.S. 286, stream of commerce theory to the case before us, we find jurisdiction is lacking. Italpast sold its products in Italy to a purchaser who traveled there for the purpose of engaging in the transaction. We do not construe this as an effort on Italpast's part to serve the California market. It was serving the purchaser who arrived to do business with it in Italy. True enough, it may have been foreseeable that the machines could wind up in California, inasmuch as the purchaser in question happened to have an office in California. But this is

not the same as saying Italpast had or should have had an *expectation* that the products would be sold to California *consumers*.

Indeed, the only evidence Carretti provided to show Italpast may have had reason to foresee a particular resale in California was one invoice marked for shipment to Los Angeles. Yet other invoices were marked for shipment to Atlanta and Chicago, respectively, and one reflected that the consignee in that instance was located in Russia. Overall, Italpast's expectation should have been that the goods would be resold in the United States or abroad, wherever Carretti did business, with no particular focus on California. While Italpast ultimately became aware of the customer located in Benicia, California, the record does not reflect whether Italpast became aware of that customer before or after Carretti resold the machine that injured Salgado. The record does indicate that Italpast shipped replacement parts to the Benicia customer and visited its plant only after Salgado had been injured and therefore after the resale of the machine that ultimately came into the possession of Pasta Bravo.

### (2) Stream of commerce theory post-World-Wide Volkswagen

#### (a) United States Supreme Court

The United States Supreme Court has given further consideration to the stream of commerce theory post-*World-Wide Volkswagen, supra,* 444 U.S. 286. The court pondered the application of the theory in *Asahi, supra,* 480 U.S. 102.

In *Asahi, supra,* 480 U.S. 102, the plaintiff was seriously injured in an accident in California when he lost control of his motorcycle. He filed a product liability action in California, alleging the accident was caused by a defective motorcycle tire and tube. He sued Cheng Shin Rubber Industrial Co., Ltd., the Taiwanese manufacturer of the tube, and Cheng Shin filed a cross-complaint against Asahi Metal Industry Co., Ltd., the manufacturer of the tube's valve assembly. The plaintiff settled and thereafter dismissed his claims against Cheng Shin. Only Cheng Shin's cross-complaint remained. The court held "the exercise of personal jurisdiction by a California court over Asahi in this instance would be unreasonable and unfair." (*Id.* at p. 116 [107 S.Ct. at p. 1034].)

A majority of the court stated: "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." (*Asahi, supra,* 480 U.S. at p. 114 [107

S.Ct. at p. 1033].) It further advised that "a court [should] consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction by the California court. The procedural and substantive interests of other nations in a state court's assertion of jurisdiction over an alien defendant will differ from case to case. In every case, however, those interests, as well as the Federal interest in Government's foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State." (*Id.* at p. 115 [107 S.Ct. at p. 1034].)

While the majority of the court concluded reasonableness and consideration of the policies of other nations dictated the result in the case, the justices disagreed on the application and interpretation of the stream of commerce theory. A plurality of four justices, led by Justice O'Connor, interpreted the stream of commerce theory to bar the assertion of jurisdiction in the case. They concluded "[t]he 'substantial connection,' [citations], between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State.* [Citations.] The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." (*Asahi, supra,* 480 U.S. at p. 112 [107 S.Ct. at p. 1032] (plur. opn. of O'Connor, J.).)

Were this the opinion of the majority, this "stream-of-commerce-plus" theory would provide a simple answer to the case before us. Italpast did not purposefully avail itself of the benefits of doing business in California simply by placing its machines into the stream of commerce in Italy, without any further indicia of intent to serve the market in California. It did not design the allegedly defective machine for the California market, advertise in California, provide regular advice to customers in California or market the product through a distributor who agreed to serve as its sales agent in California. Italpast was aware the stream of commerce might sweep its

product into California, but according to the cited plurality opinion, this would not be enough.

On the other hand, four justices in a concurring opinion authored by Justice Brennan disagreed with the "stream-of-commerce-plus" interpretation. As they put it, "[t]he stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." (*Asahi, supra,* 480 U.S. at p. 117 [107 S.Ct. at pp. 1034-1035] (conc. opn. of Brennan, J.).) They continued: "[M]ost courts and commentators have found that jurisdiction premised on the placement of a product into the stream of commerce is consistent with the Due Process Clause, and have not required a showing of additional conduct." (*Ibid.,* fn. omitted.)

While this concurring opinion puts the focus on simple awareness, the manufacturer must be aware the product "is being marketed in the forum State." In the case at hand, there is evidence of only two machines being put to use in California over a seven-year period and evidence Italpast marked only one order for shipment to Los Angeles as the port of entry, with the ultimate destination unknown. It is a stretch to construe this evidence as showing Italpast was aware of any regular marketing in California or the "regular and anticipated flow of products" for retail sale in the state.

Carretti discounts the opinion in *Asahi, supra,* 480 U.S. 102, because it was rendered by a divided court. Yet under either the plurality opinion or the concurring opinion cited, there is no specific jurisdiction over Italpast.

(b) *California and other courts*

It is likely, however, that courts interpreting *World-Wide Volkswagen, supra,* 444 U.S. 286, and *Asahi, supra,* 480 U.S. 102, would reach differing conclusions as to whether there is specific jurisdiction in this case. As explained in *Felix v. Bomoro Kommanditgesellschaft* (1987) 196 Cal.App.3d 106 [241 Cal.Rptr. 670, 69 A.L.R.4th 1] (*Felix*), there are divergent lines of authority on the proper interpretation of the stream of commerce theory. "[M]any courts have relied on *World-Wide Volkswagen* as providing justification for the exercise of jurisdiction over a foreign corporation based on no more than the act of placing a product in the stream of commerce. [Citations.] Other courts, however, have held that a nonresident's mere awareness that the component it manufactures or sells outside the forum state will reach the forum in the stream of commerce is insufficient to establish jurisdiction

under the due process clause. [Citations.]" (*Id.* at p. 114.) After a discussion of the competing viewpoints expressed in *Asahi,* the *Felix* court concluded: "[W]e are of the opinion that the strictures of the due process clause forbid a court from exercising personal jurisdiction over a foreign corporation that merely places its products into the stream of commerce even though it may foresee that those products will ultimately wind their way into the forum state." (*Id.* at pp. 114-115.)

Carretti frowns on the opinion of the California appellate court in *Felix, supra,* 196 Cal.App.3d 106, because it cited the "stream-of-commerce-plus" theory with apparent approval. He suggests we disregard this California authority and adopt the analyses of other courts, notably those set forth in *Roberts v. Owens-Corning Fiberglass Corp.* (S.D.Ind. 1999) 101 F.Supp.2d 1076 (*Roberts*) and *Hedrick v. Daiko Shoji Co., Ltd., Osaka* (9th Cir. 1983) 715 F.2d 1355 (*Hedrick*).

The court in *Roberts, supra,* 101 F.Supp.2d 1076, applied the stream of commerce theory to extend personal jurisdiction over a Canadian corporation whose asbestos arrived in Indiana through a third party. The fact the Canadian corporation was not registered to do business in Indiana, and had no agents, employees, offices, property or bank accounts in the state, did not defeat personal jurisdiction, because the corporation had "purposefully delivered its asbestos into the stream of commerce, by transferring it to various manufacturers and distributors with the expectation that it would reach Indiana." (*Id.* at pp. 1081-1082.) The court analyzed the Canadian company's product distribution system at length, including deliveries to third parties and deliveries directly to Indiana. The court summed up by stating: "The appearance of [the defendant's] asbestos in this state was not random or fortuitous, but was the result of a conscious effort by [the defendant] to exploit a chain of distribution so entrenched that it embraced all of the major trading areas of the United States, including Indiana." (*Id.* at p. 1083.) The same can hardly be said in the case before us. Italpast did not have a distribution system even remotely comparable to the one in *Roberts.*

The next case Carretti cites, *Hedrick, supra,* 715 F.2d 1355, predates *Asahi, supra,* 480 U.S. 102. In *Hedrick,* a Japanese manufacturer was held subject to the jurisdiction of the federal court in Oregon when a wire-rope splice it had manufactured failed and injured an Oregon longshoreman. The company had no contacts with the state except to the extent the ship on which the splice was located happened to be docked there. The appellate court nonetheless held that the defendant had "performed a forum-related act when it produced a splice that it knew was destined for ocean-going vessels serving United States ports, including those of Oregon." (*Hedrick, supra,* 715

F.2d at p. 1358.) According to the *Hedrick* court, "A manufacturer or supplier of a defective product who knew or should have known that a product would enter the stream of foreign commerce can be subjected, consistently with due process, to a forum state's long-arm jurisdiction and be sued in the forum where the injury occurred." (*Ibid.*)

Carretti urges us to accept this viewpoint and asserts that *Hedrick, supra,* 715 F.2d 1355, is still good law after *Asahi, supra,* 480 U.S. 102. (See *Western Helicopters v. Rogerson Aircraft Corp.* (D.Ore. 1989) 715 F.Supp. 1486, 1490.) However, he fails to mention that the viewpoint of the court of appeal in *Hedrick* was disapproved by a plurality in *Asahi.* While it is true that the disapproving language in *Asahi* did not represent the opinion of the majority of the justices of the Supreme Court, it is nonetheless significant inasmuch as it casts doubt on the *Hedrick* rationale. (*Western Helicopters v. Rogerson Aircraft Corp., supra,* 715 F.2d at p. 1489.) For this reason, the continuing vitality of *Hedrick* in the Ninth Circuit Court of Appeals was questioned in *Omeluk v. Langsten Slip & Batbyggeri A/S* (9th Cir. 1995) 52 F.3d 267, 271. There, the court stated: "*Hedrick* is expressly disapproved in *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 111, 107 S.Ct. 1026, 1031-32, 94 L.Ed.2d 92[, *supra*], so if that portion of *Asahi* is the law, then *Hedrick* is no longer the law of this circuit. [Citation.]" (*Omeluk v. Langsten Slip & Batbyggeri A/S, supra,* 52 F.3d at p. 271.) Moreover, the *Hedrick* decision was subject to criticism even in advance of the *Asahi* decision. (See *Sousa v. Ocean Sunflower Shipping Co., Ltd.* (N.D.Cal. 1984) 608 F.Supp. 1309, 1312-1314 [criticizing *Hedrick*'s interpretation of *World-Wide Volkswagen, supra,* 444 U.S. 286].)

While Carretti would have us follow *Hedrick, supra,* 715 F.2d 1355, and disregard *Felix, supra,* 196 Cal.App.3d 106, *Felix* is not the only applicable California decision. Carretti contends *Cassiar, supra,* 66 Cal.App.4th 550, and *As You Sow, supra,* 50 Cal.App.4th 1859, support his position. In *Cassiar,* as discussed above, we held there was no general jurisdiction over the Canadian corporation that sold thousands of tons of raw asbestos to California operations over a period of 38 years. However, we held there was specific jurisdiction. It was clear from the long history of direct sales to California plants that the Canadian corporation intended to serve the California market. (*Cassiar, supra,* 66 Cal.App. 4th at p. 556.) But in the case before us, there is no similar history of direct sales to California users.

The court in *As You Sow, supra,* 50 Cal.App.4th 1859, held there was specific, but not general, jurisdiction over an Illinois paint manufacturer who made sales to private California distributors 16 times in six years. In reaching this conclusion, the court reviewed the California Supreme Court decisions in *Buckeye Boiler Co. v. Superior Court* (1969) 71 Cal.2d 893 [80

Cal.Rptr. 113, 458 P.2d 57] (*Buckeye Boiler*) and *Secrest Machine Corp. v. Superior Court* (1983) 33 Cal.3d 664 [190 Cal.Rptr. 175, 660 P.2d 399] (*Secrest*). *Buckeye Boiler* was decided before *World-Wide Volkswagen, supra,* 444 U.S. 286, and *Secrest* was decided afterward.

The California Supreme Court in *Buckeye Boiler, supra,* 71 Cal.2d 893, 902, stated that "[a] manufacturer engages in economic activity within a state as a matter of 'commercial actuality' whenever the purchase or use of its product within the state generates gross income for the manufacturer and is not so fortuitous or unforeseeable as to negative the existence of an intent on the manufacturer's part to bring about this result. [Citations.]" It also explained that "[o]nly if isolated use or purchase [of a product] conclusively establishes lack of foreseeability that the product will enter the state is the isolation necessarily fatal to jurisdiction over the manufacturer . . . ." (*Id.* at p. 904.)

However, in recognition of the opinion in *World-Wide Volkswagen, supra,* 444 U.S. 286, the California Supreme Court has lessened somewhat the emphasis on foreseeability. In *Secrest, supra,* 33 Cal.3d 664, the court made reference to the above quoted language from *Buckeye Boiler, supra,* 71 Cal.2d 893, and thereafter acknowledged that "[t]he United States Supreme Court recently emphasized that foreseeability that a manufacturer's product would enter or cause injury in the forum state is not itself a sufficient basis for the assertion of jurisdiction over the manufacturer. 'Hence if the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.' . . . (*World-Wide Volkswagen Corp. v. Woodson*[, *supra,*] 444 U.S. 286, 297-298 [62 L.Ed.2d 490, 501-502, 100 S.Ct. 559].)" (*Secrest, supra,* 33 Cal.3d at p. 670.)

Harmonizing the analyses in *World-Wide Volkswagen, supra,* 444 U.S. 286, and *Secrest, supra,* 33 Cal.3d 664, the court in *As You Sow, supra,* 50 Cal.App.4th 1859, concluded that "we must look to see if the defendant purposefully availed itself of the benefits and protections of California law to make it reasonably foreseeable to be 'haled into the court in the forum State' to defend itself in an action relating to its products. (*World-Wide Volkswagen Corp. v. Woodson, supra,* 444 U.S. 286, 297 [62 L.Ed.2d 490, 501].) When a manufacturer makes a direct effort to serve the market for its product in the forum state, the requisite level of foreseeability is met. (*Secrest, supra,* 33 Cal.3d 664, 670.)" (*As You Sow, supra,* 50 Cal.App.4th at

p. 1870; see also *Vibration Isolation Products, Inc. v. American Nat. Rubber Co., supra,* 23 Cal.App.3d 480 [no jurisdiction over a West Virginia corporation that sold its product to a Minnesota corporation, when the former was unaware its product was being resold in California].) The effort to serve the California market was shown in *As You Sow.* The court concluded the defendant manufacturer had "purposefully consummated business arrangements with California companies on 16 separate occasions so it could profit from the products' use in California." (*As You Sow,* at p. 1871.)

However, under the particular circumstances of this case, we simply cannot say that random sales in Italy to a distributor who happens to have an office in California but may resell its products anywhere is tantamount to an effort to serve the market in the state. Italpast hardly has the kind of purposeful contact with the forum that the defendant did in *As You Sow, supra,* 50 Cal.App.4th 1859. It has not cultivated the California sales market by repeatedly sending merchandise to various California distributors. There is no evidence that at the time of sale Italpast knew its machines were being delivered to California, except on one occasion, and even then, it did not know if California was the ultimate destination, or just the port of entry.

E. *Conclusion re Minimum Contacts*

As made clear in *World-Wide Volkswagen, supra,* 444 U.S. at page 295 [100 S.Ct. at page 566], " 'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." Were foreseeability the criterion, "[e]very seller of chattels would in effect appoint the chattel his agent for service of process. His amenability to suit would travel with the chattel." (*Id.* at p. 296 [100 S.Ct. at p. 566].) "This is not to say, of course, that foreseeability is wholly irrelevant. But the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there. [Citations.]" (*Id.* at p. 297 [100 S.Ct. at p. 567].)

Carretti would have Italpast appoint its pasta-making machines agents for service of process. Italpast's conduct in selling its machines in Italy, and its connection with the state by virtue of sales to a buyer with a California office, are not such that Italpast should reasonably anticipate being haled into court here. Under Carretti's analysis, if pushed to extreme, California courts could assert jurisdiction over any unsuspecting European vendor who just happened to sell its wares to a foreign visitor with a California residence. "But the mere 'unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact

with the forum State.' [Citation.]" (*World-Wide Volkswagen, supra,* 444 U.S. at p. 298 [100 S.Ct. at p. 567]; accord, *Thos. P. Gonzalez Corp. v. Consejo Nacional, etc.* (9th Cir. 1980) 614 F.2d 1247, 1251, 1253 [only foreign defendant's activities in California, not those of the international trader who did business with the defendant, could supply the basis for jurisdiction].)

Here, the sales to California users took place through the unilateral activity of Carretti. He has provided scant evidence of any knowledge on Italpast's part as to whether, or how often, its products were resold in California. In order to fill this evidentiary gap, Carretti, in a declaration dated May 9, 2000, stated: "In my conversations with members of the Italpast company, I frequently refer to our customers in California." There is no indication of when he began making these references, how many California customers there were or the types of Italpast goods they may have purchased or the quantity or dollar value of the same. Carretti has only shown us that two machines were resold in California and Italpast sent representatives to deal with one of the purchasers on two occasions. These few contacts with the state are not such that the assertion of jurisdiction would comport with " ' "traditional notions of fair play and substantial justice." ' [Citations.]" (*Vons Companies, supra,* 14 Cal.4th at pp. 444-445.) (See also *Thos. P. Gonzalez Corp. v. Consejo Nacional, etc., supra,* 614 F.2d at p. 1254 [jurisdiction lacking when defendant's visits to the forum are unrelated to transaction at issue].)

In reaching this conclusion, we do not mean to " 'suggest[] that the fact that a foreign manufacturer or seller rids itself of title by a sale F.O.B. a foreign port is enough to insulate that manufacturer or seller from jurisdiction.' [Citation.]" (*Roberts, supra,* 101 F.Supp.2d at p. 1083.) We also do not mean to suggest that a foreign manufacturer can evade jurisdiction by hiding behind a middleman who acts as a regular distributor of the manufacturer's products in the state. (See *Asahi, supra,* 480 U.S. at p. 112 [107 S.Ct. at p. 1032] (plur. opn. of O'Connor, J.) ["marketing the product through a distributor who has agreed to serve as the sales agent in the forum State" may show an intent to serve that state's market]; *Buckeye Boiler, supra,* 71 Cal.2d at p. 902; *Sousa v. Ocean Sunflower Shipping Co., Ltd., supra,* 608 F.Supp. at p. 1313.) However, Carretti was not Italpast's sales agent in California, and indeed, Italpast had none.

F. *Fairness Considerations*

Because the minimum contacts necessary for jurisdiction were not established in this case, the burden did not shift to Italpast to demonstrate that the exercise of jurisdiction would be unreasonable. (See *Vons Companies, supra,*

14 Cal.4th at p. 449.) Therefore, we need not consider the reasonableness factors and forum non conveniens arguments the parties raise. (*Felix, supra,* 196 Cal.App.3d at p. 117.)

We nonetheless acknowledge that "California has a substantial interest in providing a forum in which a California resident may seek redress for injuries sustained here in the course of his employment. [Citation.]" (*Secrest, supra,* 33 Cal.3d at p. 672.) At the same time, we observe that Carretti, not the injured plaintiff, is the one challenging the trial court order on jurisdiction.

Carretti makes a practice of traveling to Italy to do business and was the one who got Italpast involved. We pay heed to the admonition of the United States Supreme Court majority in *Asahi, supra,* 480 U.S. at page 115 [107 S.Ct. at page 1034]: " 'Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.' [Citations.]" All things considered, it is not unreasonable for Carretti to have to pursue redress in Italy, where he purchased the allegedly defective machine.

III

DISPOSITION

The order is affirmed. Respondent shall recover its costs on appeal.

Sills, P. J., and Aronson, J., concurred.